George Lee Tucker, II v. Bryan Collier, et al. Good morning, Your Honors. May it please the Court. I'm Sam Perone, counsel on behalf of Plaintiff Appellant George Lee Tucker, II. Your Honors, this case involves Mr. Tucker's challenge to the State's total ban on communal religious exercise by nation adherents in the State's prisons. At the outset, I want to emphasize, number one, that Mr. Tucker's burden is not at issue on this appeal, because the State has conceded that its policy constitutes a substantial burden on Mr. Tucker's sincere beliefs. Number two, and as we've argued in our briefing, we think that either prong of the strict scrutiny analysis requiring the State to demonstrate that it is further to compelling interest through the least restrictive means provides a ground for remand. So while we urge the panel to reverse on both grounds, the panel could choose to decide this case on only one. On the compelling interest, is it your position that, in the abstract, it could be a compelling interest to not facilitate racial unrest in the prison, but it hasn't been demonstrated that this is necessary? Is that what your position is? You're not saying that it's not a compelling interest to keep racial tension at bay in a prison, are you? I think it's undisputed, and we won't dispute, that prison security as a general matter is a compelling State interest, as this Court has held time and time again. I think whether the activities of so-called supremacist groups is by definition per se a question of prison security, and it goes to that, is another question. I think on this record, as you pointed out, there is no evidence that the nation— Well, I didn't agree. That's a question. I'm not disagreeing. I'm neither agreeing nor disagreeing. So on this record, it's your position that there is no evidence of it? Exactly. And we think the issue of whether the State would have a compelling interest in preventing congregation by groups who have so-called supremacist views in general is simply not before the panel. But in the grand scheme of things, Your Honor, we do not dispute the fact that prison security in general goes to the State's compelling interest. Does this record have a review that this particular offshoot of Islam, N-O-G-E, has a racial component to it? I mean, is that established? Your Honor, the State's undertaking here was to look broadly at the policies of other States and to undertake an interpretation of nation theology based on a smattering of sources that it found in assorted places. There is no evidence in this record suggesting that Mr. Tucker has supremacist beliefs or believes in racial superiority, and there is no evidence in the record that any other nation adherent in Texas prisons possesses those beliefs. Okay. And this is N-O-G-E, which is distinct from – you call it nation, but this isn't the same thing as the nation of Islam. Correct. And it's not the same thing as traditional Islam, either, that, in fact, they've had issues when he's gone into those services. Is that correct? That's right. The group at issue here is the Nation of Gods and Earths, which broke off from the Nation of Islam in, I believe, 1964. And, of course, the Nation of Islam was an offshoot of the more general Muslim religion. So you're correct, Your Honor, that this group is distinct from either of those groups. But, you know, you said there's no showing that Mr. Tucker himself holds these views, and that's fine. But the point is one of his deprivations of religious rights, according to him, is the ability to communicate with others and have time with others who share his beliefs, share N-O-G-E's beliefs. And so even if I attend a church and they have 10 beliefs and I believe in 9 of them but not the 10th, nonetheless, the other people there might believe in the 10th. And I'm still in a church that holds that 10th belief, whether I personally share it or not. So you would agree that the N-O-G-E does have views that objectively could be viewed as racial superiority of one race over another? I think there are two points here, Your Honor. I think, number one, Mr. Tucker does not possess these beliefs. Number two, there is no evidence in the record that any nation adherent in Texas possesses a so-called belief of supremacy, which I think is also a crucial point here. Whether we perform an individualized inquiry as required by Hull v. Hobbs and required by our LUPA, whether we look at Mr. Tucker or the nation adherents with whom he wishes to congregate, the answer is the same, that the state adduced no evidence as to their beliefs. But then turning to the more general question. I mean, if I join the X, Y, Z group that believes that Y is God, and I say, well, I don't share that belief, but I'm in the X, Y, Z group, I mean, how can you say that? In other words, a group has its beliefs, and that's what makes them the group that wants to congregate. If we all just have a bunch of different views, I think X should be president, you think Y should be president, she thinks Z should be president, then we can be a group, but we aren't a group that holds the same beliefs. So then there's no religious deprivation there to not letting us congregate. I think the critical point to understand here is that the nation does not have supremacist beliefs. And I think the state's misunderstanding on this record, when it's pointed to these phrases taken out of context, it has viewed them as having supremacist connotations when they, in fact, have completely different meanings. And as courts have held before, nation adherents do not have supremacist beliefs. So nation itself is not supremacist, but then also the nation as practiced by Collier and his colleagues does not have supremacist. So it would be kind of like, we could all be Baptists, but if we were before the Civil War, some people Baptists would be in the South Side, and they might believe in slavery, and then Baptists might actually have to have different offshoots because they had a disagreement over that. So is that your position, that you can't say that just because you're a Baptist that you're either pro or for during the Civil War time period? I think that's right, Your Honor, and maybe an example would be helpful. Nation of gods and earths, as the state has identified, believe in the inner divinity of black men and women, black men being gods and women being earths. And I think this belief in inner divinity has been construed as a supremacist belief. But if you look closely at this belief, this is really a belief in self-affirmation and self-definition, and that individuals who adhere to the nation's teachings can attain some level of control over their lives and understanding of the world, and that instead of thinking of God in the traditional sense and worshiping in the traditional sense of how others might understand God, they look inwards for that strength and understanding. So you're saying there is no aspect of that thinking that only one race can have inner divinity that is pejorative to another race? I think, Your Honor, the record contains no evidence that nation adherents have ever advocated violence against another group. I think this belief in inner divinity is not a belief that compares adherence to those of another race. I think there truly is an argument to be made that this is separate from what the state has construed it to be. Okay, so you're not saying – are you saying they couldn't make a record, or are you saying they didn't make a record? Yeah, that's the question. They just didn't make a record. So the state didn't make a record on two points, Your Honors. I think there's the least restrictive means prong and there's the compelling interest prong. On the compelling interest prong, our lupa requires the state to perform an individualized inquiry into the beliefs and characteristics of Mr. Tucker and will admit in this case, because he wishes to congregate with other adherents, those with whom he wishes to congregate. The state here undertook no investigation into the beliefs of inmates in its prisons. And if you look at the state's reasoning in responding to the inmates' request for congregation, it says word for word, based on results of investigations within other states' correctional facilities, this group uses teachings of racial supremacy. So I think, number one, that goes to the compelling interest prong and shows that the state failed to engage in the required analysis under our lupa. But number two, if we turn to the least restrictive means prong, which requires the state to not just explain what action it chose, but to demonstrate affirmatively that it chose the least restrictive means of furthering an interest, we'll see here that the state considered no evidence of alternative means to allow Mr. Tucker to practice his faith while still furthering a compelling interest. I think this is problematic, number one, because the state actually has to prove that it chose the least restrictive means. You know, beyond thinking about this in the abstract, the record bears this out. If we look at the affidavits of Van Strum in the record or Kelvin Scott, there is no statement supplied by the state that banning all communal religious exercise by nation adherents is the least restrictive means. This is a litigation position the state took in the court below, but this is not actually supported by any evidence in the record. And that's problematic here, especially because the record contains evidence of less restrictive alternatives. Do you want to address the failure to exhaust on the other claims? Sure. Your Honors, Mr. Tucker has raised a number of grievances requesting nation congregation. We feel that in requesting nation congregation, certain items that would be part and parcel of any sort of communal religious exercise would go along with that. So, for example, Mr. Tucker has requested access to nation texts. He's requested access to a lay leader to come in and lead congregation. We feel that. By the way, I thought somehow this is not my first rodeo on these cases. I thought that the prison system allowed for an outside person to come in. Not only allowed it, but I thought that's what they wanted. I think that's correct, Your Honor. So they're not prohibiting him from doing that. There just there just isn't one at the moment, right? I'm not sure that the record speaks directly to that issue. But either way, the district court held that that claim was not exhausted. Okay. But so essentially we feel that these claims that Mr. Tucker raised are part and parcel of any sort of form of religious exercise. If a Christian wanted to congregate with other Christians, you'd expect that they'd want maybe a Bible and hymn books and a pastor to be present. And we think that that applies with equal force here. That kind of isn't how exhaustion works. And I realize that you need to liberally construe anything that a pro se litigant may have done and so on. I get that. But you have to be very specific and clear with the prison about what you want because it might be they don't let you congregate but they will give you a Bible, for example. And that's certainly better than nothing. So if what you want is you want to congregate, you want a Bible, you want a hymnal, you want a minister, you've got to ask for all four and then they may or may not give it to you and then you challenge what they don't give you. Your Honor, I want to circle back to the compelling interest prong, if I may. And, you know, we've spoken about the nation beliefs in the abstract, and we've focused on the lack of the individualized inquiry into whether any nation adherents possess such so-called supremacist beliefs. But I also want to focus on the more general point that the state has adduced no evidence that any nation adherent in its prisons poses a security risk generally or as a result of their beliefs. And you'll see that when Mr. Baker and Mr. Tucker filed their requests, the state expressly declined to find any security concern. The state's Security Threat Group Management Office looked into the nation following inmate Baker's request and specifically found that the nation does not constitute a security threat group. The state's motion for summary judgment to the district court conceded that it has never sustained a security incident with any nation adherent in its prisons. And I think, you know, plainly there are issues of fact in this record as to whether there are any violent tendencies of any of these individuals. There are issues of fact as to whether any of these individuals actually has a supremacist belief. And we feel that, you know, these alone are sufficient to provide a ground for reversal. When you say there's a question about whether they have a supremacist belief, is that based on your argument that the inner divinity is not a supremacist belief? Or is it your position that they do not have that inner divinity belief? And I'm not taking a position on it. I'm just trying to understand your argument. Yeah, I think most directly, Your Honor, the evidence shows that Mr. Tucker does not have those beliefs, nor do any other nation adherents in Texas. So they don't believe in their inner divinity as being of a particular race. I'm sorry. I see my time's out. Can I? Yes. No, we, to clarify, we believe that Mr. Tucker, we represent that Mr. Tucker believes in his own inner divinity consistent with the beliefs of all nation adherents. We do not view that belief as supremacist. Okay. I just want to be clear on that. And we also just point the panel to the statements in the record in which Mr. Tucker has stated that he is not pro-black or anti-white. And where he's pointed to texts describing the nation's founders, inclusion of white people, incorporating them as disciples and urging adherents not to be, not to hold views, you know, that would be anti-white. So can everybody in his view have inner divinity? All men? I think the Muslim chaplains affidavit provides the best evidence on this. And at ROA 1037, he states that this group is based on the belief that if they should adhere faithfully to the group's teachings and commit every word of the group's lessons of the divine sciences to memory, that they could progress to be gods and earths. So I think it's sort of a rite of passage that you need to go through in order to attain that status. Thank you. Thank you. May it please the court. Andrew Davis for the appellees. I'd like to start, Judge Haynes, with one of your questions about whether the individualized inquiry is the right inquiry here. And it's not. And that is because there are really two aspects to Mr. Tucker's claim here. The first is whether the group, the nation, should be able to meet. The second is that he should be able to meet with that group. Because the state has a compelling interest in preventing the group from meeting, it necessarily has a compelling interest in preventing him from meeting with the group. But in Davis v. Davis, we emphasized the individualized determination that was significant and said you needed to make an individualized determination. So hasn't that ship sailed? No, Your Honor. Quoting Holt. Correct. So there's a distinction here between cases such as Davis, Ali, and Holt. When a prisoner is seeking an exception that applies only to him or her, it's important to have that individualized inquiry. So, for example, in those cases, if there's a general policy about how long someone's hair can be, and they want an exception to that, it's necessary for the state to determine whether the imposition of that requirement on that individual serves a compelling interest. But here, the question is not, is Mr. Tucker allowed to meet with some preexisting group? The claim is that there has to be a meeting of this group to begin with. Right, and he's saying my group is not racist, and we want to meet. And so an individualized determination needs to be made as to whether his group, and I'm just saying racist. It's more complicated. I'm just using that as a tag word. We're not racists, racial supremacists, and so we want to practice this faith in this particular way. And so then you have to determine whether their practice of faith would be a racist thing. Not whether some global understanding of the faith in some other parts of the country or the world are done in a racial manner. That might be a background informed to say you need to watch or keep an eye on or something to see if it developed into that. But you have to look at it from his individualized, with his friends that want to do this religion. Well, I think, Your Honor, it's important to recognize that when asking for a group to meet, there is a plan set up in the prisons where there are all types of different groups. And these groups may have individuals coming out, coming in, converting, both because they're coming into prison or leaving, as well as perhaps converting from one to another. So that's why the state needs to look at the group itself to determine whether it can meet. And it's not to say that the state is in the business of interpreting what is the correct understanding of the nation's teachings. That can be up to an individual to understand by himself what the teachings mean. But it is up to the state to read the materials and determine whether they have racial supremacist teachings, but did you look at any materials that Tucker proposed to use or did you just read? I mean, is there any evidence in the record that any materials were read at all? I thought the record was only that some inquiry was made about what some prisons in other states did. No, there's absolutely evidence in the record, Your Honor. Okay. What is the record? So I point the Court generally to 1045 and on. There's a long section that is taken from, it is from a forum, as he notes. But there's no contention that these are the fundamental texts. A forum? It was an online site that housed the fundamental texts of the nation. So somebody went online to look up about this religion. Is that what you're saying? What did Texas do? What Texas did was, there was a multifaceted approach. So one part of the approach was talking to other prisons to determine how they treated this group. That was an email, that's in the record, what the other states responded with their approaches. There's also a number of different sources about the teachings of the nation. So, for example, there's an article by an anthropology professor, which describes a group... Consulted sources. Where did they get the sources that they chose to consult? We're trying to decide if they fulfilled their duty to show a compelling interest. Yes, Your Honor. I do not know where they originally got these, how they were appointed to them in the first place. But what is shown in the record is that there are the teachings that are undisputedly the fundamental teachings of the nation. For example, you have the supreme mathematics, the supreme alphabet. They have the lost found Muslim nation, Muslim lessons. These are texts that no one disputes are fundamental to the religion. I believe my friend in opposition's brief at five, he mentioned these sources. Okay. Anything else that they did? Is that it? They looked at fundamental texts or sources brought to their attention through an article by an anthropologist, correct? To be clear, the article from the anthropologist is separate from the text. Okay. Looked at two different things. One fundamental text, one anthropologist article, and talked to other prisons. They also have various sources within the record, reports by different groups. They had a gang expert who had evidence. They looked at cases that had been previously discussing about the nation. But I think it's important here to focus on the fact that when a religion is wanting to meet, the best evidence of their beliefs are the fundamental texts. And that's especially true here. Is that true for any religion? I think many religions don't even inhabit fundamental texts. And they may just be spiritual enlightenment or not have any. It seems like it's an interesting thing to say as a blanket statement. That's a fair point. And I don't mean to make it as a blanket statement for every religion possible. But I think here on this record where there's evidence, and as my friend said a minute ago, that part of the path for adherence to the nation is to recite these texts. These texts are their Bible. I don't want to make a comparison, one religion to the other. But as part of their development, they're supposed to learn these texts, to memorize them, to commit themselves to them. And because of that, that is why these texts are singularly important. Your counsel opposite has explained why his position and his client's position is that their belief about inner divinity is not itself racist. So I want to understand if a group of people believes that because of their ethnicity, they are chosen by God, is that a racist view? No, the difference here is specifically what is in the text that separates groups from one another. And I would point the court, for example, to the specific supremacist views that are in their texts. So for example, at 1051 and 53, these are in their fundamental text. There are multiple references to a specific group, Caucasians as the devil. They have specific parts where they say that the original people, which are their ethnicity, the original people, their lives are of supreme value and have no comparison. These are not simply statements about the inner divinity that a person holds God within them. These are statements that are saying you are supreme to another race by definition of your race. It's also important to recognize that these teachings, which appear throughout, also have connections not only inherently to violence. As the record shows at 1040, a prison official talks about how in prison, oftentimes the actions of racial supremacist groups are the result of the undergirding ideology that preaches them. But there are even specific terms. But you can certainly have racist groups that are not claiming any religious context to it. They just simply believe that. Correct. Okay. So here you have this situation where you're saying it isn't – well, I want to be clear because I guess if we rule your way, it's possible we may have to find this line. Because every religion has different views on chosen by God, things like that, so on and so forth. It's a complex area for courts to get themselves in the middle of. Your position is that when a religion teaches that this group is superior to another group, then that's when it crosses the line that allows the prison to put these kinds of restrictions on. I think the keys here are the pejorative language towards other groups. Aren't there pejorative languages used in other major texts of other major and minor religions that are used in prison? If you can pick things out of their text that also use pejorative language? People are called names and derogatory statements made about people in other major texts. I mean, you can just think of them off the top of your head. Yes, Your Honor. It's not to say that there may not be other religions that have statements that are within the broader text that may be taken in that vein. But the difference here is that these are fundamental aspects of the nation in the sense that if you look at the primary text, the supreme mathematics, the lost found Muslim lessons, these have these statements such as another race being the devil, that you need to have, that there's no comparison, that the white man is by nature and practice devilish and primitive. And that's at ROA 865. These aren't simply a one-off. It's the state looking at the general text and determining how they will play essentially in prison. I'm sorry. So if you have an assuming arguendo that you've established compelling state interest, you still have to show that you've used the least restrictive means. Yes, Your Honor. And that a total ban is not, that's not ever a first step. And it's my understanding that there's been no violence with petitioners of this faith throughout the prisons. Is that correct? There is no specific evidence that there has been violence. But as this Court specifically said in Chance, prisons do not have to wait for violence to materialize. Right, but what about have monitoring as a first look, you know. Sosomon requires an articulable, particularized approach in the least restricted means. And we know that other prisons, since you were using other prisons earlier, have a system where they have somebody sit in to make sure that they're not doing these racist things. Yes, Your Honor, so the fact that other prisons, for example, do this is not enough to create a fact issue at summary judgment. Well, you used it on your side of the docket just a minute ago to say it helped create the compelling interest. That's that other prisons ban it. So that other prisons ban it creates a compelling interest, but that other prisons allow it with some monitoring can't be used for least restrictive. That seems to be not parallel. Your Honor, the main focus here, what the other states said about them banning it is not necessary to resolve this case. And that is because the fundamental texts show the racial supremacist views that the record links up through the expertise of prison officials that racial supremacist views create violence. Okay, the hard part to me, I don't want to get in the middle of, I mean, I'm very much respectful of people's rights to different religious views or no religious view at all. But if we're going to get into violence in the name of religion, as Judge Elrod alluded to, if we look at the history of the world, there has been violence in the name of a number of different religions. Does that then permit the prison to prohibit people from practicing those religions? Because that would get rather broad. I'm just talking about the history of the world and I'm not casting aspersions on anyone or anyone's beliefs or anything that's happened. I'm simply saying there has been violence in the name of a lot of major religions, rightly or wrongly. Okay, again, I'm trying very hard to be neutral, not trying to take a position, I'm not trying to be inflammatory. I'm making a statement of history. How then can you support the difference here is this is a lesser known religion? Why does that justify a different outcome? You know, I disagree that the difference is that it's a lesser known religion. I think the difference here is that it is the fundamental text that preached this. So, for example, if you take a religion that may have had a past where they were involved in conflict or violence as a result of their religion. Now, if it's not fundamental to the text, one that could be seen as past. But it's important to realize that if, for example, take a major religion. It doesn't matter which one, just a hypothetical major religion. And there are adherents at the prison which believe that these texts call them to violence. It's not actually in the text, but that's their interpretation of it. The state would have an interest in preventing those individuals from. And that's when we get to the individualized inquiry. Why isn't it? Why are the Odin is treated differently then? Because their literature also allegedly contains these supremacist views from the white supremacist view, according to the record. According to the briefs. Your Honor, I would respectfully disagree with that characterization that is made by my opponent in his brief. The there is some indications in cases that suggest that Odin is have some affiliation in some context with white supremacist groups. And to the extent those are in Texas and there's no evidence of that whatsoever in the record. That would be an excellent reason to not let the Odin is meet. But you're saying if it was in Wisconsin, that wouldn't be a good reason to keep the Odin is out of Texas, right? Well, the difference again and pushing to the distinction that I was making earlier between the texts and the specific adherence. If there were evidence that the Odin is texts advocated racial supremacy in the same way that the nation's texts do, then they would be on parallel and they should both be. Well, it's my understanding that your brief at page 13 lists a whole bunch of other jurisdictions that have banned in OGE because of their determination that it's that it's supremacy. And then Wisconsin has commented that the Odin is or white supremacist. So what you for a minute ago, you said we shouldn't look at these other jurisdictions in the end. But then your brief looks at other jurisdiction and kind of leads with that, actually. You know, and that's I understand that the we make the argument in our brief that the what other states are doing has a bearing and can be taken into consideration. And we're not going to walk away from that. But your point about whether the Odin is or the racist, racial supremacist texts can lead to violence and to your... Let me ask you, your opposing counsel has directly taken that on by saying Mr. Tucker and his fellow congregants don't believe. He didn't put it quite this way, but don't believe those expressly comments like Caucasians are the devil or whatever, that that's not part of them. That they're focused on their inner divinity, they're focused on bettering themselves, and they're not saying that somebody else is better than them. So if that's the case, maybe that's a denomination of NOGE, why can't they congregate? They are renouncing the notion, or I can ask more specifically, but I understood him to say they're not proclaiming this kind of view of Caucasians as the devil, for example. So then why can't they meet? You know, that comes to, again, the difference between letting a group meet and letting individuals. And if there were a group, for example, that didn't have racial supremacist views, whether or not Mr. Tucker had those views and wanted to join the group would be extraordinarily relevant. But the point here is that he's asking for a group to be able to meet. Counsel opposite, as I understood him, and I could have misunderstood him, said no one in Texas of this group has these views. They're focused on their inner divinity, et cetera. Perhaps that's not accurate, but that's what he's saying. Why isn't that the individualized review you should make, the individualized review of the Texas group that is seeking to congregate? Do they think that somebody else is evil because of their race? Your Honor, two points to that. First, the evidence about what the potential congregants believe is limited to Mr. Tucker and one other individual, Mr. Barker. That's not the entirety of Cofield unit, much less the entirety of the state. So that's simply, we don't know what the beliefs are of every adherent in the nation. But perhaps more importantly, the fact is that take a much larger religion. If it has 100 people, the analysis can't be for the prison to have to go through and determine whether every single one of those people holds what belief. When they're asking for a group to congregate, what needs to be determined is looking at what that religion generally believes, what its texts are. And it's not to determine whether or not any belief is correct. It's to determine how these teachings will affect the prison and the prison security. And that's what's critical here, is underlying this all is the fact that prison is a volatile environment. It is filled with many people in close quarters, which is why you have to give substantial deference to each prison official who has expertise on this. And there are often, I mean, it's no secret there are lots of racial tensions in prisons throughout Texas and throughout the United States. So when you have statements like this, that one race is the devil, and then you have statements such as that each member of the nation should murder the devil, that the pale person is in a race with time to avoid the wrath of the nation. These are things that taken objectively can create a security risk within the prison. Counsel, I'm sorry, I don't really believe that you've answered my question about Sosomon, and we went on to something else. But Sosomon wasn't a group. It was one gentleman who wanted to kneel before the cross. And there were all these other services going on, and it wasn't convenient, and there was an issue that they didn't want to let him do that. And the court said, why can't you figure out a least restrictive means and still uphold all your religious beliefs? There's services and all the other things going on, but let him practice his faith. And it didn't, two things, it didn't depend on a group, other people doing it. And also, it was determined that there hadn't even been any adequate exploration of least restrictive means. So why aren't, can you address both of those points vis-a-vis this case? Yes, Your Honor. So to take the second issue first about whether the, in Sosomon they said that the state hadn't considered other options. Here in the Religious Practices Commission, they put out their report that includes descriptions of what other states had done. So they were more than aware of what other options were, what other states were doing. And yet they decided that a total ban was the only way to do this. So they did consider other options and decided that this was the least restrictive. But we don't have to, we don't give deference to that, do we? We have to actually look to see whether it's the least restrictive means. Your Honor, yes, it is the court's obligation to look at it, but there is deference that is still owed. Because the least restrictive means is still an analysis of the prison security. And to the extent that the prison is making a judgment about what marginal changes in the ability to meet, how they affect security, that is certainly due deference. Turning to the individual aspect of this, in Sosomon, if I recall correctly, it was an individual who wanted to pray in front of a cross in a chapel. And the state denied him that ability. And part of his argument on least restrictive means was that he should be able to because the church building was used for other purposes. And so the court had to look at whether or not his actual use of the church, there was a compelling interest on that. Here, however, the compelling interest is about the group's teaching. So it's not simply whether having Mr. Tucker as part of that group is the least restrictive means. It's about whether the group itself can meet. It would be as if a group wanted to meet in that chapel. You would have to look at whether that group posed a risk. And that is why this case is different from Sosomon on the least restrictive means. Your Honors, I want to begin by just emphasizing the point that this case came to us on summary judgment. It was decided on a summary judgment record. So the relevant question on all of these issues is whether genuine disputes of fact exist on which reasonable fact finders could differ. I want to turn very briefly to the least restrictive means problem. I think it's important to recognize here that the Supreme Court in Holt and this court recently in Ware have emphasized that in instances when other states employ less restrictive alternatives, the state must at minimum provide a persuasive explanation as to why that alternative would not be sufficient here. And despite the state's lack of consideration of other alternatives on this record, the record actually shows that Michigan, Iowa, Oklahoma and Massachusetts all permit nation congregation. What do you do if the opposing counsel says they did consider but they just rejected? Your Honor, there's no beyond the fact that... They issued a report. They issued a report and beyond the fact that there are emails from other state prison systems that reference their accommodation of nation adherence congregation, it does not occur that the state weighed these other alternatives or explained, which I think is the key point, why they would not be applicable here. The report does not explain it. The report provides no explanation whatsoever as to why a total ban is the only means of accomplishing the state's interest. I think on the least restrictive means prong alone, we can reverse the district court. Turning to the compelling interest prong and the failure of the state to perform an individualized inquiry, again, I want to emphasize that whether we look at Mr. Tucker or the group of adherents with whom he wishes to congregate, the record is still devoid of evidence as to either group. So I think the state's argument that we really need to consider the group as a whole within Texas prisons still fails, given the summary judgment evidence. I think also on the compelling interest prong, the state has advocated a position that states should just look at religious texts in general and derive a conclusion from that interpretation of religious theology. If we think about the implications of that, number one, it would completely upend the long line of cases in the circuit's precedent, the Supreme Courts under ARLUPA, that require an individualized inquiry. As a practical matter, ARLUPA exists to ensure that these religious rights are respected and exists so that states are forced to compile rationales that allow district courts and appellate courts and the Supreme Court to evaluate whether they are actually following ARLUPA's requirements. I think if you had a case where a state could simply make a conclusion as to the merits of religious beliefs based on those texts alone, we'd be unnecessarily injecting courts into that theological determination, which I think stands in stark contrast to all of the existing precedent. Finally, your honors, I think on the compelling interest prong, the record contains clear evidence that the state has not and that the state's policy here is under-inclusive because the state permits Odinists to congregate in its prisons. And whether you look to the record or whether you look at a number of other cases that exist in this circuit and in Texas District Courts, the group of Odinists is widely associated with white supremacist beliefs in its prisons. And I think it's important to recognize that the state is the one who put this fact in issue by stating that we, as a state, would like to prevent all so-called supremacist groups from congregating. I ask you a question. Sure. Are you from Ropes and Gray? I am. Well, bless you. I take it that it's all gratis. We were appointed pro bono, your honor. Yeah. Thank you for your service. Thank you. If there's nothing further, we ask that the panel reverse the District Court's grant of summary judgment and remand for trial. Thank you, counsel. Thank you, your honors.